Our last case of the morning is agenda number 6, case 116532, People of the State of Illinois v. Nicole G., Department of Health Care and Family Services. Are the parties ready to proceed? Proceed. Good morning, Your Honors, and may it please this Court. My name is Timothy Maggio. I'm an Assistant Attorney General, and this morning I represent the people of the State of Illinois. Your Honors, in this particular case, the Juvenile Court Act and the Illinois Parentage Act embrace common sense. A child has a biological father, and perhaps an adoptive father. Those two special relationships are recognized in Illinois law, and they ought not be lightly disregarded, and they ought not be lightly terminated. But when a man comes to a juvenile neglect proceeding, and he is neither the child's biological father nor the child's adoptive father, the State should have the ability to excuse him. The State should have the ability to exclude him. He should not have the right to participate in decision-making, discussions, consents to adoption regarding a child with whom he is unrelated. And that conclusion is all the more certain in a case like this, where the child herself, acting through her guardian, supports the State's activity. Did the GAL file a petition? Pardon me? Did the GAL file a petition in this case? The GAL did not, Your Honor. But with respect to that, Your Honor, the GAL certainly did support the State's motion when it was being argued. And I should say, we don't have, in the record, we don't know whether the GAL supported that prior to the motion being filed or after. But the one thing we are positive of is that in the circuit court, the GAL argued forcefully in favor of a finding of non-paternity, and forcefully in favor of excluding the father from these proceedings. And let me just say broadly, and we can move on to the specifics of the case, is that in terms of the State's burden for excluding the father, the State should be required to prove one simple thing, the truth. If the State comes in and proves that the gentleman is not the child's father, biologically or adoptive, then he should be excluded. Would that hold forth even if that father had acted as a father to the child? I mean, I realize here we have a small child, but we're going to make precedent here for the State. And, you know, there are circumstances where a man thinks he's the father of the child and is involved in the parenting and raising of that child. The courts have long taken the position that those relationships are precious, and we're not inclined to just tell somebody that's got a relationship with a child, well, you're out of the box. How could we address this without doing violence to that circumstance? I think we're talking about a few different issues. It might sort of take them apart for purposes of this answer. In terms of whether we're trying to get him out of the box, that's not what this is about. If there's a parent-child relationship, if they still cohabitate, if there's a loving relationship, none of that changes just by a finding of non-paternity in a child neglect proceeding. All of that remains the same. So there has to be more than just showing he's not the biological or adoptive father. Is that what you're saying? No, not for excluding him from the child neglect proceeding. What we're talking about, on the one hand, is people coming in and having a right to say, a legally recognized right to input into the process, as opposed to, I thought what Your Honor was talking about, the familiar relationships and whether we're going to enter some sort of order that disturbs that. If the gentleman wishes to have a legally recognized right, then I suppose the question back to him is, well, why not simply file for adoption? If you file for adoption, if a court identifies you as somebody who is appropriate to adopt, then you have the legally recognized right. Then you're able to participate in a child neglect proceeding. But, you know, as we – and I should say, by the way, that's not the situation we have now, but I understand Your Honor is asking hypotheticals for the broader issue, right? Right. But, you know, one of the questions in this case is, you know, sort of the simplicity of the correction. If the gentleman who signed the VAP wanted to have a legally recognized right, he could simply go into court with the mother and adopt. Why does he need to do that? Could we talk about the statute? The statute itself, the presumption of parentage 45-5, it is conclusive after the VAP is signed, after there's been a judicial proceeding, and that took place here. It goes on to say that it has the same force as a judgment of the court. So why – what burden is there on this person to do anything other than what he did in conformance with the statute? Well, I think if I understand Your Honor's question correctly, I think, again, we're talking about two slightly different things here, right? The conclusiveness under the Illinois Parentage Act and the provision, I believe, in 6b of the Parentage Act that talks about has the force and effect of a judgment. Those are provisions that are binding on the father, perhaps binding on the mother. We have one appellate court decision in Illinois that is binding on the mother, but certainly binding on the father, and it gets to, with respect, Your Honor, the whole point behind the Illinois Parentage Act, right? And it's important to note we have sort of two different things happening here. We have the Juvenile Court Act, which is designed to entrust the safety of the child. Now, that's broad, right? It's physical safety. It's emotional safety. It's financial safety. But then we hop over to the Illinois Parentage Act, and today we see the Parentage Act as, again, doing a lot of things, but one of the things it certainly is designed to do is to support child support orders as a function for child support orders. And so if a gentleman comes in and he's signed a VAP, he's had 60 days in order to say, well, I want out. If he doesn't do that, okay, then he's conclusively bound. It's a judgment. He can't get out of that. He can't come back three days or, pardon me, three years later and say, I've changed my mind. I'd rather not pay child support. That all makes perfect sense, right? But in terms of him coming into the safety, the physical safety, the welfare safety forum of the Juvenile Court Act, why does his willingness to sign a VAP to be financially responsible necessarily translate into his ability to speak in the juvenile court about the future of that child? Because the statute says both the Parentage Act and the Juvenile Court Act provide that parentage issues in juvenile court proceedings are governed by the Parentage Act. Well, two things, I suppose. One, in terms of governed by the Juvenile Court Act says that if issues of parentage apply, or if there are issues of parentage arise, I should say, then the Illinois Parentage Act applies and the circuit court should issue orders consistent with that, right? We've suggested to the Court in the papers that what that means is that you take the principles of the Illinois Parentage Act and the Juvenile Court has the ability to issue orders consistent with that. This Court has also said, though, that the hallmark, the talisman, the central issue in all issues of child neglect is the best interest of the child. And so if we find ourselves in the Juvenile Court Act, I suppose one of the things you could say is that we've offered ways under the Illinois Parentage Act and also under the Juvenile Court Act to say that if it's in the best interest of the child, this man ought to be excluded. And they could have a termination petition. Pardon me? A termination petition against the father. Well, I suppose that's one of the questions that's sort of lurking here. Why not go ahead and file the termination petition? And we might as well just discuss that right now, if I may, right? I mean, the question is really why should the State be required to do that, right? Why should the State be required to do that? I suppose there are three responses to that. One, and I know it sounds a little naive today, but it's just not right. Why does the State need to pretend? If we're in a world where people are recognized to be the father because they're biologically the father or they're father by adoption, why does the State need to pretend that a man who is neither has the right to appear in the juvenile court proceeding? And, in fact, I'm not entirely sure, and the record doesn't talk about this, but I mean, you know, I'm not entirely sure whether Alfred would have been able to satisfy the Adoption Act, right? If you have somebody who is not able to adopt, why would you say that man is able to give himself the rights of an adopted parent by signing into that? But second of all, it's the establishment of parent and child relationship. The statute provides the establishment of the father-child relationship. And the statute makes clear that the father-child relationship occurs in only two ways. One, the natural father. Second, an adoptive father. What we're talking about, Your Honor, what we're talking about even under the Illinois Parenting Act are presumptions, right? We're trying to figure out who the biological father is. One of the presumptions we have is that if you're married when the child is born, you're the biological father. That presumption can be overcome. It's a presumption. We have another presumption, that if you go ahead and you voluntarily describe yourself as the father by signing a VAT, that's a presumption. That does not mean that you are the father. And, Your Honor, if what we're talking about is, all the more, a presumption that arises in the context of trying to secure child support payments, why should that presumption, why should that be conclusive against the state in a context where the state is trying to ensure the physical and emotional welfare and safety of the child? And so what we've suggested, Your Honor, and I suppose there's two other reasons behind it. Your Honor asked, why not just go ahead and terminate parental rights? Let's pretend that, in this case, Alfred were the father, and let's terminate his rights. He's the conclusive father. He's conclusive as to himself, Your Honor. I don't mean to be contrarian on that. But there are no cases in Illinois, and, in fact, the appellees have suggested that this is driven by federal law. They haven't identified a single case in Illinois law under federal jurisprudence or anywhere else where a VAT presumption is conclusive against someone other than the signatories. And, in fact, in Illinois, we have appellate court decisions that have made clear that it is not conclusive against any of the other signatories. And we have in-ray unidentified parentage, in-ray MN, where the questions in those cases were when you have a child. A child came and wanted to disestablish paternity. And the response was, well, there's a VAT and it's conclusive. And the court said no, and it makes perfect sense, Your Honor. If a man goes in and signs a document, how can that signature preclude everyone else from their rights? How can we do this? And really, you can hear what I'm trying to do. Please, can we talk about the statute? Yes, Your Honor. Explain the parentage statute to us. That's really what I'm trying to get you to. Under what section of the parentage statute did the State have the standing to move to remove the father? I don't want to use that word, but to remove the father. Under what section of the parentage act are you, did you proceed under? We suggested three under the parentage act. May I start with section 7B? Right? Section 7B is the provision that says that the child certainly has the right to exclude, move to disestablish the father. Right? Everyone here agrees, I believe. I think all the parties agree that the child could have filed a petition, even the court of appeals suggests, the appellate court suggests in a footnote, that the child could have moved to disestablish the father. If the child had moved to disestablish the father, acted through a GAL, the court could have ordered genetic testing, which is what happened here, without objection. And if that genetic testing determined that the gentleman was not the father, then he would be excluded. No conclusive this, no fraud and duress that. He'd simply be excluded. So if we're looking at the world of 7B, what's the dispute here? Right? What's the dispute here? The child wants, the child could move under 7B to remove the father. The child wants the father removed. So then the only open question is whether it's available to the state to prosecute that. And in that sense, that's when we turn to this Court's decision in In Re D.S. Right? In Re D.S. I think teaches us two things. One thing more important than the other for purposes of this case. D.S. is a case that's very similar here. Right? D.S. is a case where the guardian files a petition for termination of parental rights, and the state's attorney disagrees. The state's attorney thinks it's a bad idea. And so D.S. teaches us first that if there's a bunting of the heads, that it's the circuit court that's the arbiter. That the circuit court gets to decide what's actually in the best interest of the child. Under which statute? Pardon me, Your Honor? The neglect statute? Which statute are you in D.S.? Are we talking about? In D.S. we're talking about it proceeding under the neglect statute. Neglect statute. I'm sorry, Your Honor? You said yes, the neglect statute. All right. And thank you for that. Because that's actually the particular crux of this. Right? Because the second thing that D.S. Well, let me just finish, by the way. The first D.S. teaches us is that if there's a bunting of the heads, the circuit court gets to decide. And the circuit court can compel the state's attorney to move to terminate, even if the state's attorney doesn't want to. Even against his or her wishes. But the second aspect of D.S. that's important for us is that it's holding that it is the state's attorney and only the state's attorney that gets to prosecute the petition for termination of parental rights. And, in fact, in D.S., as the court knows, the guardian actually argued that he or she should have the ability to petition in his or her own right. And the court said no. And there are two really sort of fundamental and sound basics for that. One, in the particular world we're dealing with, with juvenile justice, in the unique world of juvenile court actions, right, it's the state that is the real party in interest. Right? One, you know, a handful of words and people don't know what, you know, criticize just sort of invoking that term, but what it means is that it's the people of the state of Illinois that are entrusted with deciding how to go about ensuring that the child's best interests are served as well as the interests of the community. And so they're the ones who are given that responsibility. They're the real party in interest to prosecute that case. But second, the sort of common sense behind the rule is that the state needs to speak with one voice. Right? It doesn't make sense that we would go into a juvenile neglect proceeding, which, by the way, is supposed to be expeditious, supposed to quickly resolve the interests of the child. It doesn't make sense that we would go into that proceeding and the state could file some motions, the guy could file motions across purposes, and we don't speak with one voice. Well, let me speak, just speaking with one voice. I see your light is on. You're arguing today that it was under 7B that was the proper statutory section for you to proceed. Isn't it true that at the hearing the state stipulated that you did not have standing under 7B, but argued instead that you could proceed under 60? Yeah. Two quick responses, Your Honor, with my time. I don't want to slice and dice too closely on that, but at the hearing the state stipulated that it could not proceed, it could not file under 7B as I understand it. Right? That's not what we're talking about here. What we're talking about here is a petition, if you will, a movement initiated by the child, by the guardian. Our argument... Wait, wait, wait. Please tell me. You just argued that you have standing under 7B. Yes. But in the trial court the state conceded it did not have standing under 7B. Is that correct? The trial court, the State's attorney did say that it could not seek a petition under 7B. That's correct. And the petition was under 6D. Do you have standing under 6D? And that they are under 6D. And yes, we have standing under 6D as well. Quickly, 6D is a statute that's really well suited for the State because it doesn't have any requirements as to who may or may not bring it. It simply says that a vapid may be challenged in court based on showing a fraud, mistake, or duress. Right. And what we have here in this particular case is the circuit court actually made a finding that there was a mistake of fact. And that finding is not against the manifest weight of the evidence. What was presented to the court is Alfred, the father, telling the court that he in fact is the father and that he had sexual relations with the mother in May or June of 2011, approximately nine months before the child was born. We have Nicole representing to the circuit court that when Alfred signed the VAP, he represented one, that he was the father, and two, that he had a reasonable belief that he was the father at the time. And then third, we have the whole point of the VAP. When you sign the VAP, you're telling the world voluntarily that you are the biological father of the child. Right. That's the whole purpose of it. It's voluntary. It's not compelled. But you're telling the world that you're the biological father. So the circuit court is faced with that predicate, Alfred saying that he was the father, saying he had sexual relations, Nicole saying that he had a reasonable basis for believing he was the father, and the VAP that says to the world I'm the father. And then in contrast, we had DNA testing. And as the court well knows, the DNA testing established that the probability of Alfred's paternity was zero, 0.00%. He was not the father. And so, at the end of the day, Your Honor, let me be clear. We've offered four opportunities, or four ways to get from A to B, to explain the state's basis. The 7B basis, though, is to say that it is the child under 7B acting through her guardian. Pardon me, Your Honor. Thank you. Good morning, Your Honors. May it please the court, counsel. I am Diane Potts, Deputy Attorney General for Child Support, and I am appearing today on behalf of the Department of Health Care and Family Services, which has been allowed to intervene in this appeal. Your Honors, every year, over 43,000 acknowledgments of paternity are executed  And this is the first time that the Department of Health Care and Family Establishing parentage through the acknowledgment process has been an integral part of the law in Illinois and every other state since the mid-1990s when Congress mandated the acknowledgment process for all states and their child support programs. The acknowledgment process affords parents like Alfred a simple, non-judicial method to embrace fatherhood and assume parental rights and They forego their right to biological certainty and genetic testing when they execute that acknowledgment with the child's mother. There is no ambiguity as to the legal effect of these acknowledgments. Both Illinois and federal law provide that each acknowledgement, if not timely rescinded, establishes a legal father and child relationship that has the same force and effect as a judgment of parentage and cannot be ratified by any court. After signing that acknowledgment, the father's name is placed on the child's birth certificate by the Department of Public Health and there is no longer any open question as to this child's paternity. Acknowledgments, however, are not unassailable. They can be set aside by a court when requested by the child or the legal parents under certain narrow circumstances circumscribed by Section 7B and 6D of the Parentage Act. And they also do not tie the hands of biological fathers from coming forward and establishing themselves as the legal father for the child under Section 7A and Section 11 of the Parentage Act. The clear state of this law notwithstanding, the state is asking this court what it boils down to is they are asking for a broad, unprecedented power to disregard acknowledgments in juvenile court proceedings and afford them no legal weight, conduct genetic testing on legally established, unmarried parents, and if the test results show that that legal father is not the biological father, use that test alone to justify that father being expelled from the juvenile court proceedings and, in essence, from that child's life. Now, the state does not claim that this broad power is necessary because of the specific facts, unique facts of this case, nor can it. At the very first court proceeding, the state acknowledged, Alfred, you are the legal father of NC. Yet, without any explanation, a few days later at the very next court proceeding, the state demanded genetic testing on NC and Alfred. Now, the state's true motive for this genetic testing did not become apparent until their reply brief, page 1, where they say the state does not want to expend services, time, and assistance in abuse and neglect cases on legal fathers if disestablishing paternity provides the easy way out. But genetic testing and disestablishing paternity are simply not the role of the state's attorney and the state in abuse and neglect cases. Let's go way back to one of the first remarks made by Mr. Maggio here. There's no quarrel, and I think that's where we're going to go here, that under 7B, the GAL would have standing to disestablish paternity, right? Yes, Your Honor. Right. So under the facts of this case, somewhat unorthodox, what do we do with the fact that the GAL did join orally in the argument that the state made in this motion? And as a result of that, is there any violation to the JCA or the IPA? And is there any prejudice to the GAL here since they were arm-in-arm with the state as they proceeded on the motion? Well, I think the most important part, as my answer to this question, is that there's no evidence that the GAL wanted the genetic testing nor would have moved independently for the genetic testing. There was no question raised by anyone, the parents, the state, the GAL, that Alfred was not, in fact, the father of NC. And so it's hard to unring that bell once genetic testing was done and that the genetic test results came back excluding Alfred. But this case is so fundamentally important because it will dictate the procedures that the juvenile court will follow for other cases, for other children, for other legal parents. So the fundamental problem with the GAL deciding late in the game that it was going to join the states and side with the state as far as disestablishment was it was only dependent upon those genetic tests, which never should have been permitted in the first place. I think there's no doubt that, and no question, that the Juvenile Court Act embraces parentage as defined in that parentage act because the definition of parent in the Juvenile Court Act says it's as established under the Parentage Act. And the Parentage Act says it applies in every civil case in which parentage is an issue. If parentage issues arise, the Parentage Act governs. And clearly, Alfred was established as NC's legal parent under Sections 5 and 6 of the Parentage Act, and the inquiry for the state should have ended absolutely right there. Genetic testing on established parents by the state is simply not allowed under Section 11 of the Parentage Act. And the state's entire case rests on these genetic test results. Your Honors, proof of a genetic connection is not the basis of parentage in Illinois. Parentage, as you know, can be established three different ways, marital presumption, acknowledgement, or an adjudication by a court, none of which requires a precursor of genetic testing or proof of a biological relationship. The state admits that Alfred believed himself to be NC's father when he signed that acknowledgement, and the law protects fathers like Alfred who do the right thing and assume those relationships voluntarily and seek to participate in their children's lives. Requiring the state to recognize valid parentage establishments is compelled by the clear terms of the Parentage Act and the federal requirements for the child support programs. The state does not have standing under Section 7B. Its role is abuse and neglect, not genetic testing, not disestablishment. The GAL alone represents the interests of the child, and the GAL did not seek genetic testing and did not file a petition to disestablish and has voiced no support of the state in this appeal. But, yes. I just want to ask a question. What's happened during the pendency of this to the parties? That I am not aware, Your Honor. I apologize. My co-counsel, however, may be able to speak to the factual issues of what is currently going on in the juvenile court, but we know that Alfred has been removed from the juvenile court proceedings and can no longer participate as a parent for GAL. You know, the fraud, duress, material mistake, effect elements of Section 60 are something that belongs to the parents alone because they are the signatories of those acknowledgments. As this Court held in the Smith case, we are looking at the voluntariness of that acknowledgment at the time it was executed when you have a challenge under 6D, and that's something that's going to belong to the parties themselves, the parents themselves. It doesn't belong to the state. It doesn't belong to the state based upon genetic tests. So in conclusion, Alfred believed he was NC's father and established a legal parent-child relationship. He should continue to be NC's father until the state takes the proper steps under the Juvenile Court Act to terminate that relationship. The conclusive nature of acknowledgments removes the question from the state's powers as far as who is the parent of NC and establishes for law and for the world that Alfred is NC's parents. And for all of those reasons, Your Honor, and those, Your Honors, and for those forth in my brief, we ask that the appellate court be affirmed. The appellate court correctly decided that the state does not have standing in juvenile court proceedings. Thank you. Thank you. May it please the Court, my name is Louis Melo. I represent the respondent mother below. We are asking the Court today to affirm the appellate court's decision because it's clear that not only did the state's attorney not have standing but lacked express authority to file a motion to determine the nonexistence of paternity. Also, we ask the Court to affirm the appellate court below because a juvenile court proceeding is the wrong form in which to seek to disestablish a legal father's paternity. And even if the state's attorney did have authority, it failed to prove that there was fraud or a material mistake of fact as to whether the presumed father in this case voluntarily executed that voluntary acknowledgment of paternity, which I will refer to as a VAP. In the present case, as the Court is aware, the state's attorney is the one that filed the motion to determine the nonexistence of paternity. We contend that the state's attorney did not have standing either in the Illinois Parentage Act or the Juvenile Court Act to file a motion to illegitimize the child. Since the Juvenile Court Act dictates that the Illinois Parentage Act governs matters pertaining to parentage, we look to the Illinois Parentage Act to determine whether it authorizes the state's attorney to file petitions to disestablish paternity. In so doing, we discover there is nothing in the Parentage Act that expressly authorizes the state's attorney to disestablish paternity. We know that those who can bring actions to disestablish paternity are listed under Section 7b and b5 of the Parentage Act. There again, no mention of the state's attorney. And as far as I could tell, there is no other section in the Parentage Act that identifies or authorizes the state's attorney to file motions to determine the nonexistence of paternity. Contrary to the appellant's claim, Section 6d of the Parentage Act is not a catch-all provision that lets anybody file a motion or invites anybody to file a motion to disestablish paternity. Rather, it is the only section that lays the grounds for which the disproved attorney, particularly in the case of a signatory of that. If anything, the appellant... Mr. Melo, Ms. Potts indicated that when I was asking her about the fact that the guardian joined in on the motion to disestablish, she said it was, it all came out of the genetic testing. And I note that is it important at all that when there was a motion made by the state with respect to genetic testing that Alfred didn't object? Is it important? I'm sorry, the last part. Does that have any import at all? Ms. Potts said that the testing should have never been done, the state should have never been able to acquire those tests, and I just noted that Alfred didn't object to the test, to the genetic testing. Looking at that as if we are going to look at it all, whether or not the GAL in coming in on the argument of the motion to disestablish, if we look at that as being no prejudice and not contrary to either of the acts. Well, I can't change the facts, but obviously the reality is that I suspect that, and I don't know why the father did not object. I don't have that information. It may very well have been that he did believe he was the father or that notwithstanding the fact that he was or was not the father he was prepared to carry out the duties of the father, which is readily apparent at this stage. In answer to Justice Burke's question, they're now married or were married at or about the time, so this is a family unit we're talking about. With respect to the guardian ad litem, joining in on the motion, number one, I don't know what considerations the guardian ad litem was employing, whether she was even considering the best interest of the child. She certainly could not have talked to the child, given the infancy of the child. It's very hard to ascertain what the motivation may have been, and so I can't speak for the guardian ad litem as to what that motivation was, but the point is it was not the J.L. who filed. We may very well have asked for a child representative for a child in that event anyhow. Mr. Melo, just to follow up on Justice Thomas, when was the first challenge to standing raised? Basically at the point of the hearing on the motion. What was the date of that? Where is it in the, you know? I don't know off the top of my head, but it should be in the record on the date of the hearing that we objected to. And to be clear, which hearing are you referring to? On the motion for nonexistence of paternity. The first hearing on that. All right. Not at the point where the DNA test was ordered, but the subsequent one.  I believe I know that I submitted some court opinions to Henry Jim and the Henry Smith case, so it may very well have been a written response to my recollection that it was written and that I submitted the authority at the time prior to the hearing. Thank you. And notwithstanding that, the court obviously went ahead and disestablished the paternity. I would argue that, in fact, if you looked at Illinois Parenthood Act and you look, it really contemplates a more limited role for the state's attorney. If you look at Section 18 of that act, granted it's representing the mother for child support, it clearly states that the state's attorney may establish and enforce child support, but no other matters. And it seems incongruent that the legislature would limit the state's attorney if it could really do whatever it wanted in the best interest of the child. In fact, given some of the state's attorney's obligations to enforce child support, in some counties in the state, the disestablishment of paternity is incompatible with them representing the people. In those counties where they're representing the people to collect child support and thereby reduce the state's economic burden for children of deadbeat fathers, the state's attorney cannot have it both ways. They can't collect child support but seek to disqualify fathers from whom they wish to collect the child support. The notion that Section 213.6 of the Juvenile Court Act either empowers or obligates the state's attorney to prosecute petitions to determine nonexistence of paternity misconstrues that section of the Juvenile Court Act. Whether the state's attorney can prosecute a petition to terminate may be true, but it's routinely the case that any party can file a motion in the best interest of the child. It happens with motions to restore the minors as parents, motions to vacate shelter care orders, motions to modify orders of protection. This was a question that probably would have been better raised with Ms. Potts, but in this particular case, if we were to agree with you that the statute says what the statute says, that typically there would be no standing. But based on the fact that in this case, Alfred did not object to the DNA test, that in this case, that the guardian in light of came alongside the state's attorney, it wouldn't stand for the proposition then that they could file a motion to disestablish parents, would it? Would it just say in this case there's really no prejudice, there's no, in this particular case, even though it was unorthodox, the GAL in a sense did participate in the disestablishment of paternity. Well, I think had the GAL filed a motion, we would have filed a very different response to that motion based on research and what we knew of the law. We would have certainly had a different response. Explain that to me. Why would the response have been different? Well, we would have been focusing on what best interest standards should we be looking at. If the GAL is filing a motion to disestablish paternity on the basis of the best interest of the child, is it looking at a juvenile court act? Because if it's looking there, there's nothing in the best interest factors that talk about the biology of the father. If it's looking under Illinois Marriage and Dissolution of Marriage Act, there's nothing there about the biology of the father. And, of course, the Parentage Act really doesn't have best interest factors. It refers to others. But if we look there, we would look at the financial issue. Well, here's a father who could potentially provide financial support. So we would look at why are you doing this on behalf of the child, and we would expect that to be answered. So it would have been a slightly different response. In this case, there was just no standing. That's why we took that approach. So I don't think it was without prejudice. It's puzzling in this case that you put all your eggs. I put all those eggs in the basket of standing, right? Didn't even have an alternative argument. If we're wrong on standing, here's our best interest argument. Because the trial court didn't agree with the standing argument, right? Is that fair? I mean, the appellate court reversed, obviously. Yeah, I think my time is up. But the court obviously reached its conclusion in whatever way it did. I don't know that it – I would assume that it ruled that there was no standing – that there was standing on the part of the State. But we disagree with that, Your Honor. Thank you. Thank you, counsel. Your Honors, may I pick up with Justice Thomas's question? I think this Court can write narrowly in this case and use the 7B option and say that the child – which everybody agrees 7B affords the child, acting through her guardian, the ability to file a petition for disestablishment. There is no disagreement here that the guardian argued forcefully in the trial court for the disestablishment of Alfred as the father. And your petition was brought under 6D, not 7B. So whatever the guardian ad liem was arguing in support of was under 6D. Does the guardian ad liem have standing, even in the sense of agreeing with the State, under 6D, which is what this petition was brought under? The guardian certainly would have had standing, and the guardian, in fact, did argue as well in the trial court that there was a mistake of fact under 6D. So to answer your question – How does the guardian have standing under 6D? Under – 6D has no restriction on who can bring the motion. 6D simply says that a VAP can be overturned in court based on ensuring a fraud, duress, or material mistake of fact. So there's no standing requirement. Another family member could bring this under 6D. Are there any limitations on who could bring the 6D motion? I should imagine that it would be limited to people with a legally recognized right and interest in the child's well-being. So a parent or – See, what is limited here? I mean, you just – you can agree with me that it couldn't possibly be that anybody could bring this. No. It couldn't be someone off the street. Right. So from the language of the statute, how do we figure out who has standing under 6D, which is what this motion was about? In terms of the broad parameters, I think the way we identify who has standing under 6D are people who have a legally recognized interest in the care and custody of the child. Now, whether or not those people need to use 6D is a different question. Mothers have other opportunities under the Illinois Parents Act. Children have other opportunities. People who have custody have other opportunities as well. But under the limited facts of this case, certainly the state, who has a parent's patria interest in the well-being of the child, who also has custody of this child, who is presumably spending resources to care for this child, has an ability to make a determination. And if I might answer Justice Thomas's question a little bit more directly, what we're dealing with is a situation – if this Court wants to write narrowly, 7B says the child could bring an action. Everyone concedes that the child wanted the father removed. There is no dispute under this record that Alfred did not object to the DNA testing. So all these qualms about DNA testing fall by the wayside. But let me also point out that under a 7B provision, the Court is entitled to compel DNA testing under Section 11. So this whole DNA testing in the 7B context is not an issue. The 7B context then simply becomes a straightforward application of this Court's decision in In Re DS. And with respect to the record, didn't the state argue below that under either 7B or 60 you had authority to bring it, or am I wrong on that? The Court of Appeals certainly considered 7B and 60 options, if I remember correctly, Your Honor. Well, yeah, the appellate court certainly did talk in terms of 7B. Yes. Right? So whether they recharacterized or whatever – Yes. In fairness, Your Honor, as I read the transcript in front of the circuit court, it was more of a broad-based discussion that Alfred is not the father, the DNA testing does not support Alfred being the father. Okay. Mr. Maggio, on a procedural question – Yes, Your Honor. Initially, the state filed a petition alleging neglect and named the mother, named the father, correct? Yes, Your Honor. As Alfred H. My question procedurally is how did you get untangled or are you untangled from that initial position in the case, initial posture? Do you understand the question? If I – I'll give it a go, Your Honor, and we'll see if I do. As the proceedings continued on, after there was a finding that Alfred was not the father by the circuit court, and the circuit court filed again in the child's best interest to remove Alfred and that Alfred had made a mistake of fact, then the state filed a – I believe it was an oral motion, made an oral motion to the court, Your Honor, asking that the petition be revised and to strike references to Alfred as being the father and to simply refer to him as Alfred. And I'm positive that's in the record. I don't have the page number for you, Your Honor. But does that answer your – is that what you're getting at? I mean, the record will stand as the record reads. But the other question is this. Does the statute on that – I don't know if this is the right term – disestablishment, whatever the phraseology is to undo that paternity, does that require a separate – I mean, is it a distinct cause of action? I mean, can it be done just by merely an oral motion? I think – you're testing me on this, Your Honor. I think the statute refers to filing of a complaint under Section 7. Under Section D, 6d, I think it just refers to that VAPs can be challenged in court based on fraud, duress, or mistake of fact. Of course, this Court has a jurisprudence from Smith regarding the mechanism for a father to challenge that under 214.01. But so the 6d is silent, I think, as to that provision. Does it ask – does it state that you have to file a verified complaint? I'm sorry, Your Honor. The 6d – 6b, rather, say that there has to be – an action has to be brought by the child, natural mother, or presumed father. It should be brought by verified complaint. Was there a verified complaint? There was no verified complaint. I'm not entirely – Your Honor has me at a bit of a disadvantage. I don't recall that 6b – 6b, if that's what Your Honor said, requires a verified complaint, as opposed to 7b. I don't know. 7a requires – also requires a verified complaint, and there requests the naming of who the actual – the other father would be. In other words, saying this person is presumed to be the father. Someone else should be the father. Right. Under 7a, you have to name that person. Under 7b, the statute says that it should be brought by the child, the natural mother, or presumed father, shall be brought by verified complaint. Yes, 7b. Your Honor, in your question, Your Honor mentioned 6b. That's why I'm sorry. That's what threw me off. 7b, which you're arguing now, which I don't suppose you argued before, requires a verified complaint. Is that right? I believe it does. Was there one filed? There was no verified complaint filed. The State filed below a verified motion seeking a finding of non-paternity. Was there an objection filed to that motion? There was not, Your Honor. There were no written objections filed to the best of my knowledge. In fact, Your Honor, I believe that to the extent that any standing question was raised, it came at the first time at the oral argument. I don't believe that there was any. I don't recall seeing any document filed regarding standing, a challenge to the standing. At the end of the day, though, Your Honor, I just want to make sure that we're sort of seeing the forest here, if I may. Right. We're talking about a juvenile neglect proceeding where the point of the proceeding is to try to determine the child's, ensure the child's best interest. And a court, if somebody appeared in that proceeding and wanted to offer an expert witness, and the expert said, well, I don't know anything about the child, I've never met the child, I don't know anything about the child's well-being, don't know anything about the child's family situation. Not to make too much of a point of it, but I'm homeless, I have no job, I don't know anything about this child. But I'm here to tell you what's in the child's best interest. I'm here to testify. I demand to be heard. I want to say my position and have my two cents. I suggest that the court would throw that expert out. I suggest that the court would perhaps listen to the expert but would not And what we have here is a situation which is, in some sense, similar to that. We have somebody, and we heard essentially in the Apollina's argument, that somebody can sign a VAP and give himself the rights of paternity. That somehow, the well-sounded law in Illinois, that you are a father if you are the biological national father, or if you are the father because you're an adoptive father. Those two special relationships we talked about before. Well, actually, there's more. That somebody can just, by the stroke of a pen, give themselves the rights of a father with no court approving it, not being biologically related. It simply doesn't make sense, certainly when you're talking about the context of a proceeding that is trying to figure out whether the child's best interest is going to be taken care of and who are the adults that are best suited to do that. Are you saying that the best interest of the child could never be to have a child's life who has filed a VAP, but is not the DNA? No. So it's not a question of best interest here? It's the ultimate determination about whether a particular man should be in the proceeding is a question of best interest. And in fact, in this case, the circuit court made a determination that excluding Alfred from these proceedings was indeed in the best interest of the child. On these facts, that is the determination the court made. Because he was not the DNA. He was not the biological father. Because he was not the biological father, it was not in the best interest of the child to have him as a legal father. It was not in the best interest of the child to have him participating in a proceeding where he would somehow direct the future of that child's life. Yes, Your Honor. Thank you. Thank you very much. Case number 116532, People of the State of Illinois v. Nicole Gee, Illinois Department of Health Care and Family Services. Will be taken under advisement as agenda number six. Mr. Maggio, Ms. Potts, Mr. Mulo, thank you for your arguments today. You are excused. Mr. Marshall, the Illinois Supreme Court stands adjourned until Tuesday, March 18, 2014, at 9.30 a.m.